*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAMES CRAIG BAKER,

Defendant-Appellant.

UNPUBLISHED
February 14, 2019

No. 340352
Wayne Circuit Court
LC No. 17-002637-02-FH

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRANDON BRENT VREELAND,

Defendant-Appellant.

No. 340752
Wayne Circuit Court
LC No. 17-002637-01-FH

Before: MURRAY, C.J., and STEPHENS and RIORDAN, JJ.

PER CURIAM.

In these consolidated appeals,[1] defendant James Craig Baker appeals by right his jury conviction of improperly transporting a pistol in a vehicle operated or occupied by him (CCW). MCL 750.227(2).[2] The trial court sentenced Baker to serve 3 years on probation but ordered him

---

[1] See *People v Baker*, unpublished order of the Court of Appeals, entered February 14, 2018 (Docket No. 340352); *People v Vreeland*, unpublished order of the Court of Appeals, entered February 14, 2018 (Docket No. 340752).

[2] The jury found Baker not guilty of disturbing the peace, see MCL 750.170, and willfully and knowingly brandishing a firearm, see MCL 750.234e(1).

to serve the first 9 months in jail. Defendant Brandon Brent Vreeland appeals by right his jury convictions of CCW; disturbing the peace, MCL 750.170; and assaulting, battering, wounding, resisting, obstructing, opposing, or endangering a person whom he knew or had reason to know was performing his or her duties (resisting and obstructing), MCL 750.81d(1). The trial court sentenced Vreeland to serve 9 months to 5 years in prison for his CCW conviction, and to serve 5 days in jail for each of his remaining convictions with credit for 5 days already served. We affirm.

## I. FACTUAL BACKGROUND

On February 5, 2017, defendants met in a park in Dearborn, Michigan. Video admitted at trial showed Vreeland exiting the driver's side of an automobile and opening the trunk, while Baker got out of the passenger side of the vehicle. Baker removed a handgun from his side, extracted the ammunition magazine from it, and placed it into the trunk next to an unopened rifle case. They briefly discussed their "plans" and decided that they would go forward with them even though they suspected they would be subjected to a traffic stop. Vreeland drove out of the park and they subsequently were pulled over. During that interaction with police, Vreeland was verbally belligerent with the officer, stating that he did not believe there was a legal reason for the stop. When the officer informed Vreeland that he was free to go, Vreeland cursed at the officer before driving away.

Defendants then arrived at the Dearborn Police Department (DPD) office, where they exited the vehicle and approached the building with Baker wearing a ballistic vest and ski-mask and carrying a handgun and an assault-style rifle in the "ready-up" position. Vreeland wore a ballistic vest, a military-style jacket that covered his sides, and a bandana covering his head, while carrying a tripod camera. The police in the office were forewarned that defendants were about to enter the DPD office while armed and dressed in paramilitary fashion. Several police officers testified that they feared defendants were prepared to carry out a mass shooting, and so the officers made ready for a potential shoot-out. One officer retrieved a rifle, noting that a handgun would not be useful against an assault-style rifle, a civilian waiting to be picked up was escorted out of the lobby, and the officers had guns drawn when defendants entered the building.

Officers, fearing for their safety, immediately requested that Baker drop his guns, but he refused to do so. They also asked Vreeland to step away from Baker, because they were unsure if Vreeland also was armed considering his jacket covered his sides. Vreeland refused the order and responded with epithets and claims that the officers' commands were not lawful. Baker eventually was disarmed and both were arrested. Neither defendant had a concealed weapon on their person at the time of arrest. Defendants were then tried, convicted, and sentenced as noted. This appeal followed.

## II. BAKER'S APPEAL

### A. CONCEALED CARRY LICENSE

Baker argues that he could not be found guilty of CCW as a matter of law because his previously suspended license to carry a concealed weapon became valid by operation of law upon the final disposition of the charges that precipitated the suspension. We disagree.

## 1.  STANDARD OF REVIEW & GENERAL LAW

This Court reviews de novo whether the trial court properly interpreted and applied the relevant statues. *People v Lee*, 489 Mich 289, 295; 803 NW2d 165 (2011).  The Legislature made it a felony for a person to carry a concealed pistol on or about his or her person, or to carry a pistol—without regard to whether it is concealed—in a vehicle:

> A person shall not carry a pistol concealed on or about his or her person, or, whether concealed or otherwise, in a vehicle operated or occupied by the person, except in his or her dwelling house, place of business, or on other land possessed by the person, without a license to carry the pistol as provided by law and if licensed, shall not carry the pistol in a place or manner inconsistent with any restrictions upon such license.  [MCL 750.227(2); see also MCL 750.227(3) (making a violation of Subsection 2 a felony).]

In order to convict Baker of this crime, the prosecution had to prove that (1) Baker operated or occupied a vehicle while a pistol was present in the vehicle, (2) Baker knew about the pistol, and (3) Baker carried the pistol.  See *People v Nimeth*, 236 Mich App 616, 622; 601 NW2d 393 (1999).  Our Supreme Court has stated that one can carry a pistol without actually possessing it because the term "carrying" encompasses constructive possession.  See *People v Butler*, 413 Mich 377, 390 n 11; 319 NW2d 540 (1982).

## 2.  ANALYSIS

In this case, there was evidence that Baker placed an unloaded pistol into the trunk of a car that he thereafter occupied.  Despite that evidence, he maintains that he could not be guilty of violating MCL 750.227(2) because he held a license to carry a concealed pistol validly issued under MCL 28.425b(7).  The Legislature provided that a "license to carry a concealed pistol issued by the county concealed weapon licensing board authorizes the licensee" to carry "a pistol concealed on or about his or her person" and to carry "a pistol in a vehicle, whether concealed or not concealed, anywhere in this state."  MCL 28.425c(2).[3]  Accordingly, if Baker had a valid license to carry a concealed pistol at the time that he occupied the car, he could not be convicted of carrying a pistol in a vehicle in violation of MCL 750.227(2).

Before the trial court, it was uncontested that Baker had been arrested in April 2015 by the Lincoln Police Department for being a disorderly person and for failure to disclose and show his license to carry a concealed pistol.  It also was undisputed that the county gun board suspended his license after it was informed that Baker had been charged with a misdemeanor, provided him with notice of the suspension, and did nothing to end the suspension or provide him with a copy of his license even after the charges against him were dropped.  Thus, Baker

---

[3] The Legislature amended the statutory scheme addressing licenses to carry concealed weapons, including MCL 28.425c, effective December 1, 2015.  See 2015 PA 3.  All citations, unless otherwise stated, are to the statutory scheme prior to the enactment of 2015 PA 3, which was the statutory scheme in effect when Baker's license was suspended.

argues the suspension of his license ceased as a matter of law after the final disposition of the earlier charges against him.

The version of MCL 28.428(3) in effect during the events at issue provided for automatic suspension of an individual's license to carry a concealed weapon if the individual had been charged with a felony or certain misdemeanors:

> If the concealed weapon licensing board is notified by a law enforcement agency or prosecuting official that an individual licensed to carry a concealed pistol is charged with a felony or misdemeanor as defined in this act, the concealed weapon licensing board shall immediately suspend the individual's license until there is a final disposition of the charge for that offense and send notice of that suspension to the individual's last known address as indicated in the records of the concealed weapon licensing board.

In analyzing this language, this Court's goal is to ascertain the Legislature's intent. See *People v Williams*, 226 Mich App 568, 570; 576 NW2d 390 (1997). If unambiguous, this Court must enforce it as written. *Id.* Moreover, the statute must be read as a whole and in context to ascertain its meaning. See *People v Cunningham*, 496 Mich 145, 154; 852 NW2d 118 (2014).

Baker maintains that the Legislature's use of the term "until" demonstrated that the suspension would last only to the point at which there was a final disposition of the charges giving rise to the suspension. Thereafter, in his view, his license was automatically reinstated by operation of law.[4] That construction does not accord with the language of the statute when construed with the statutory scheme as a whole.

Notably, the Legislature framed former MCL 28.428(3) as a command to the licensing board: the board must "immediately suspend the individual's license" upon learning that the individual has been charged with a felony or certain misdemeanors and must send notice of the suspension. The clause "until there is a final disposition of the charge for that offense" modifies this command. See MCL 28.428(3). Thus, the Legislature drafted this clause as a limit on the duration of its command to the board. Stated another way, the Legislature required the board to suspend the individual's license at least up to the point when the charges were subject to final disposition. The statutory language merely provides that the board is no longer required to continue the suspension after final disposition. This understanding comports with the plain language of the statute and is consistent with the statutory scheme as a whole. See *Cunningham*, 496 Mich at 154.

A final disposition of charges may include conviction of those charges. Thus, it is illogical to conclude that the Legislature intended to end a suspension upon conviction of the very charge that led to the suspension. Indeed, the Legislature specifically provided that a

---

[4] Notably, the board's notice of suspension did not provide that Baker's license was suspended for a specified period or until final disposition. Additionally, the board's notice included notice of a hearing and asked Baker to provide proof of disposition at the hearing.

person convicted of a listed misdemeanor within the preceding eight years was not eligible to have a license to carry a concealed weapon. See MCL 28.425b(7)(h). Moreover, even in the absence of a conviction, the board could have determined by clear and convincing evidence that the continued issuance of the license to Baker was detrimental to his own safety or the safety of others given his conduct and, on that basis, could have determined that Baker was no longer qualified to hold a license. See MCL 28.425b(7)(n). The licensing board would be obligated to revoke an individual's license if it determined that the individual was no longer eligible to hold a license either as a result of a conviction under MCL 28.425b(7)(h), or because he was detrimental to his own safety or the safety of others under MCL 28.425b(7)(n). See MCL 28.428(4).

Moreover, the Legislature provided that a suspended license is forfeited and required the license holder to return the suspended license to the board. MCL 28.425b(16). The Legislature also gave the order of suspension immediate effect but provided that a licensee could not be criminally liable for possessing a concealed weapon during the suspension unless given notice of the suspension. See MCL 28.428(7). The Legislature required the board to notify the relevant law enforcement agency when it orders a suspension or revocation. See MCL 28.428(6). The Legislature's characterization of the license as being "forfeited" upon suspension and its command that the licensee turn in the license upon suspension indicates that the Legislature intended the suspension to last until formally ended by the board. Additionally, although it provided for automatic suspension pending final disposition, the Legislature still required the board to take the required action to suspend the license—that is, it required the board to act through an order—which suggests that the board would have to act to reinstate the license as well.

When considered in light of the statutory scheme as a whole, and considering the actual language used by the Legislature, the most natural reading of MCL 28.428(3) is that the Legislature gave the board the discretion to reinstate the license or take other appropriate action after the final disposition, but not before. The board had the discretion to hold a hearing and determine what action might be appropriate in light of the final disposition, but nothing in the statute required the board to reinstate a suspended license upon final disposition. See, e.g., MCL 28.428(1) (authorizing the board to revoke a license if it determines that the licensee violated the act); MCL 28.428(4) (authorizing the board to revoke a license if it determines by clear and convincing evidence that the licensee poses a danger to himself or herself or others). Moreover, nothing within the statutory scheme provided that the suspension ended as a matter of law and without any action by the board. Rather, the statutory scheme as a whole showed that the board alone had the authority to revoke, suspend, or reinstate a license and had to do so through its orders. Because the statute did not contain an automatic reinstatement provision, this Court is not at liberty to read one into the statute. See *People v Clark*, 274 Mich App 248, 252; 732 NW2d 605 (2007) (stating that nothing should be read into a statute that is not derived from the manifest intention of the Legislature as derived from the language of the statute).

Baker relies heavily on the fact that the Legislature has since amended the statute to place the burden of obtaining a reinstatement on the licensee. The current version, which went into effect in December 2015 (seven months after Baker's misdemeanor charge), provides:

If a county clerk is notified by a law enforcement agency, prosecuting official, or court that an individual licensed to carry a concealed pistol is charged with a felony or charged with a misdemeanor listed in [MCL 28.425b(7)(h) or (i)], the county clerk shall immediately suspend the individual's license until there is a final disposition of the charge for that offense. . . . If a county clerk suspended a license under this subsection and the individual is acquitted of the charge or the charge is dismissed, the individual shall notify the county clerk who shall automatically reinstate the license if the license is not expired and the individual is otherwise qualified to receive a license to carry a concealed pistol, as verified by the department of state police. A county clerk shall not charge a fee for the reinstatement of a license under this subsection. [MCL 28.428(2).]

To the extent that the changes have any interpretive implications at all, see *In re Moukalled Estate*, 269 Mich App 708, 718; 714 NW2d 400 (2006) (providing that changes to a statute do not generally provide guidance on the proper construction of the original statutory language), the changes do not suggest that the Legislature understood the prior version to include a provision for automatic reinstatement. Notably, even the current version requires the authority now responsible for concealed carry licenses—the county clerk—to take some action to suspend, revoke, or reinstate a license. The new provision merely takes away the clerk's authority to continue the suspension or otherwise take adverse action against the individual *if* the individual was acquitted of the charges or the charges were dismissed *and* the individual provides proof of the acquittal or dismissal. Interestingly, the new statutory provision contemplates that the suspension will continue in the absence of proof of a dismissal or acquittal, notwithstanding that the statute continues to require suspension "until" final disposition. If Baker's preferred construction were accurate, and one were to apply his logic to the amended statute, the suspension would automatically end upon final disposition if the individual was convicted, but, if the charges were dismissed or the individual was acquitted, the suspension would continue until the individual presented proof to establish that the charges were dismissed or that he or she was acquitted. Therefore, the changes to the statute—if anything—reinforce the understanding that the Legislature intended to continue the suspension pending some action by the licensing authority.

The prior statute was not ambiguous and did not provide for automatic reinstatement of a suspended license. Therefore, it must be enforced as written. See *People v Breidenbach*, 489 Mich 1, 8; 798 NW2d 738 (2011). After Baker's arrest on a qualifying misdemeanor charge, the board had to suspend his license to carry a concealed weapon at least until the final disposition of his charges. See MCL 28.428(3). He also forfeited his license and had to return it to the board. See MCL 28.425b(16). Further, the suspension remained in force until the board took some action to reinstate Baker's license and returned it to him. It is undisputed that the board had not taken formal action to reinstate his license by the time of the events at issue. Therefore, the trial court did not err when it determined that he was not entitled to the defense provided by MCL 28.425c(2).

## B. PROPORTIONATE SENTENCING

Baker next argues that the trial court abused its discretion when it ordered him to serve nine months of his probation in jail. "However, because defendant has already served his

minimum sentence, we decline to review this issue. Where a subsequent event renders it impossible for this Court to fashion a remedy, an issue becomes moot." *People v Rutherford*, 208 Mich App 198, 204; 526 NW2d 620 (1994).

## III. VREELAND'S APPEAL

## A. DEFECTIVE WARRANTS

Vreeland first argues that the search warrants that authorized the search of his electronic devices were inadequate and, for that reason, the video evidence that led to the CCW charge should have been suppressed. We disagree.

## 1. STANDARD OF REVIEW & GENERAL LAW

This Court's review of a magistrate's decision to authorize a search warrant is neither de novo, nor for an abuse of discretion. *People v Martin*, 271 Mich App 280, 297; 721 NW2d 815 (2006). Rather, this Court only asks whether a reasonably cautious person would have determined that there was a substantial basis for finding probable cause. *Id.* However, this Court reviews de novo the trial court's application of the constitutional standard to uncontested facts. *Id.*

The Constitutions of the United States and Michigan both guarantee the right to be free from unreasonable searches and seizures. *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000), citing US Const, Am IV; Const 1963, art 1, § 11. A search complies with the requirement of the Fourth Amendment when conducted under the authority of a validly issued search warrant. See *Kazmierczak*, 461 Mich at 418.

A magistrate may not authorize a search warrant unless there is probable cause to justify the search. *Martin*, 271 Mich App at 298. Probable cause to search exists when the facts alleged in the warrant provide a substantial basis for inferring a fair probability that contraband or evidence of a crime will be found. *Id.* The warrant must be read in a commonsense and realistic manner to determine whether the facts alleged would permit a reasonably cautious person to conclude that there was a substantial basis for finding probable cause. *Id.*

The warrant must also particularly describe the place to be searched and the person or thing to be seized. *People v Keller*, 479 Mich 467, 475; 739 NW2d 505 (2007). The warrant must describe the place to be searched and things to be seized to provide reasonable guidance and prevent undirected discretion in determining what is subject to seizure. *People v Fetterley*, 229 Mich App 511, 543; 583 NW2d 199 (1998). "The degree of specificity required depends on the circumstances and types of items involved." *Id.*

## 2. ANALYSIS

Vreeland contends that the search warrant that led to the discovery and seizure of the video implicating him in the unlawful transport of Baker's handgun lacked indicia of probable cause. For that reason, he states, the trial court should have suppressed the search. More specifically, he maintains that the affiant failed to identify any crime for which evidence might plausibly be found on the electronic devices. He claims that a "proper search warrant and

affidavit would state exactly what crimes have been committed and exactly what evidence of those crimes will be found in the thing to be searched."

In the affidavit in support of the request for a search warrant to search the electronic devices at issue, Sergeant Jamie Carpenter described the incidents that preceded Baker and Vreeland going to the DPD office. Carpenter indicated that officers had responded earlier to the parking lot of a retail business after a caller called 911 and reported that two men were in the parking lot putting on ski masks and tactical gear. He related that the officers performed a traffic stop on the vehicle, which was driven by Vreeland. He wrote that the officers investigated the situation and did not find evidence of illegal activity, but that Vreeland and Baker were uncooperative during the stop and Vreeland shouted expletives at the officers. Carpenter averred that, after the traffic stop, an officer from a different jurisdiction called the DPD and relayed that Baker and Vreeland had been live streaming comments about the traffic stop on social media and expressed their intention to be "encountered" at the DPD. The officer indicated that Baker and Vreeland also were soliciting assistance from others who had seen the livestream.

After these averments, Baker described the events that occurred within the lobby of the DPD office. Carpenter averred that officers feared a deadly encounter and took steps to protect themselves. He stated that Vreeland in particular refused to obey commands during the encounter and resisted being taken into custody. He further indicated that Vreeland and Baker both had electronic devices on them capable of recording the incident and that both men were charged with misdemeanors. He stated that officers discovered evidence that Vreeland and Baker had relayed their experiences with law enforcement on social media. Finally, Carpenter indicated that he knew from training and experience that "individuals who commit these types of crimes, commonly will have frequent contact with each other through their cell phones both before and after their commission" and that they might discuss the particulars of the crime.

Reading the search warrant in a commonsense manner, a reasonably cautious person would conclude that there was a substantial basis for finding probable cause that evidence of a crime would be found on the devices. See *Martin*, 271 Mich App at 298. Carpenter's factual allegations established it was likely that Baker and Vreeland actively were using recording devices throughout the day at issue and that they also had used social media to discuss their encounters with officers. Contrary to Vreeland's contention on appeal, Carpenter identified illegal activities that might have been captured or discussed on the media. He noted that both men had been charged with local crimes as a result of the encounter. He also specifically stated that Vreeland resisted arrest. A reasonably cautious person could conclude that the recording devices might have captured evidence of the local crimes and the resisting arrest.

Carpenter also noted that the recording and communication devices also might include information about the intent that Baker and Vreeland had when they decided to go to the DPD office. Although intent might not be an element of the offenses with which Baker and Vreeland ultimately were charged, their actual intent and motivation were nevertheless relevant to assessing whether their actions involved a more serious criminal matter than that with which they were charged. See *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008) (noting that motive is generally relevant). That is, a reasonably cautious person examining the averments as a whole could conclude that the devices contained evidence that Baker and Vreeland intended to

disturb the peace or resist lawful commands by law enforcement officers. See *Martin*, 271 Mich App at 298.

Carpenter also noted that the officers feared a deadly encounter, which was reasonable given the earlier contentious traffic stop and the warning from another officer that Baker and Vreeland were live streaming about the stop and had stated their intent to "encounter" Dearborn police officers. As such, a reasonably cautious person also could conclude that the electronic devices might include evidence that Vreeland and Baker intended to provoke a deadly encounter or commit some other crime, but that they were prevented from doing so by the officers' quick response. See *id.* The search warrant also clearly identified the electronic devices to be searched: the devices found on Baker and Vreeland after the confrontation in the lobby, and the devices found in Vreeland's car under the authority of the first search warrant. The second search warrant was sufficiently particular under the circumstances, see *Fetterley*, 229 Mich App at 543, and was supported by averments that established a finding of probable cause, see *Martin*, 271 Mich App at 298.

The initial search warrant—the warrant request to search Vreeland's car that resulted in the discovery of the video—contained similar averments about the events leading to the confrontation in the lobby and the circumstances of that confrontation. The officer who prepared that warrant indicated that officers would like to search Vreeland's car for electronic evidence— such as a laptop, cell phone, or tablet—used to live stream the encounter. As with the subsequent warrant, these factual allegations allowed a reasonably cautious person to conclude that Baker and Vreeland formulated the intent to provoke a confrontation with the police officers and decided to live stream or record the events. As such, the magistrate could reasonably conclude that officers would find evidence of the actual events on devices left in Vreeland's car and might also find evidence of the circumstances leading up to the confrontation, which could shed light on Baker and Vreeland's motives and intent. Therefore, the averments in the first warrant were also adequate to establish probable cause to search Vreeland's car. See *Martin*, 271 Mich App at 298.

The search warrants adequately identified that officers were searching for evidence in support of the local misdemeanors and, in Vreeland's case, resisting arrest. The circumstances identified in the affidavits also supported an inference that officers might find evidence that Baker and Vreeland intended to commit a more serious crime related to their desire to confront officers. Because the warrants were sufficiently particular and were supported by averments that identified grounds for finding probable cause to search, the trial court did not err when it denied Vreeland's motion to suppress the search warrants. See *Martin*, 271 Mich App at 297.

## B. MOTION FOR RECONSIDERATION

Vreeland next argues that the trial court erred when it granted the prosecution's motion for reconsideration and reinstated the CCW charge against Baker. We disagree.

## 1. STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for reconsideration for an abuse of discretion. *People v Blanton*, 317 Mich App 107, 117; 894 NW2d 613 (2016). However,

because Vreeland did not properly raise this issue before the trial court, it is unpreserved. See *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016). This Court reviews unpreserved claims of error for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). In order to obtain relief, the defendant must show that the trial court committed a clear or obvious error and that the error affected the outcome of the lower court proceeding. *Id.*

## 2. STANDING

On appeal, Vreeland argues that the successor judge erred when the judge granted the prosecutor's motion to reconsider the previous judge's decision to dismiss the CCW charge against Baker. Vreeland, however, lacks standing to challenge that decision on appeal because he was not an aggrieved party within the meaning of MCR 7.203(A). An aggrieved party is not one who is merely disappointed over a certain result; he or she must have suffered a concrete and particularized injury. *Fed Ins Co v Oakland Co Road Comm*, 475 Mich 286, 291; 715 NW2d 846 (2006). An aggrieved party on appeal must demonstrate that he or she suffered an injury arising from the trial court's actions. *Id.* at 292.

Vreeland did not suffer a concrete and particularized injury as a result of the trial court's decision to reinstate the CCW charge against Baker. See *id.* Although the trial court's rationale showed that the court felt that Baker did not, as a matter of law, have a valid license to carry a concealed weapon, the trial court's reason for granting the motion for reconsideration did not itself harm Vreeland. Nothing prevented Vreeland from moving to dismiss on the ground that he could not be guilty of unlawfully transporting a pistol if he transported the pistol in the company of someone who had a valid license to carry a concealed weapon.

## 3. VREELAND'S ARGUMENT IS MERITLESS

Nevertheless, even if Vreeland had standing to challenge the trial court's decision to grant the prosecutor's motion for reconsideration, he cannot establish that the error harmed him. See *Carines*, 460 Mich at 763. As already discussed, the trial court did not err when it determined that Baker's license had been suspended and was still suspended during the events at issue. Accordingly, Vreeland could not assert Baker's suspended license as a defense.

Additionally, former MCL 28.425c(2)(b), which is now codified at MCL 28.425c(3)(b), authorized only a "licensee" to "carry a pistol in a vehicle, whether concealed or not concealed." It did not allow the licensee's fellow passengers to carry a pistol in a vehicle without complying with the requirements for doing so. As such, Vreeland could not rely on Baker's license as a defense to CCW. Of course, Vreeland could assert at trial that Baker alone carried the pistol, but such a defense does not rely on the validity of Baker's license. Rather, it is a challenge to the prosecution's ability to prove the elements of CCW as to Vreeland. See *Nimeth*, 236 Mich App at 622 (stating that the prosecution must prove beyond a reasonable doubt that the defendant carried the pistol).

Vreeland lacked standing to challenge the trial court's decision to reinstate the CCW charge against Baker. In any event, Vreeland failed to establish that any error in the trial court's decision harmed his defense. See *Carines*, 460 Mich at 763. The trial court did not err when it

determined that Baker's license was suspended during the events at issue, and Vreeland could not assert Baker's license as a defense to the extent that he himself carried a pistol unlawfully.

## C. MOTION TO DISMISS

Vreeland next argues that the trial court should have dismissed the charges against him as a matter of law where his behavior was protected by the First Amendment to the United States Constitution, and thus, he had the right to resist his unlawful arrest. We disagree.

### 1. STANDARD OF REVIEW

This Court reviews de novo the proper interpretation of a statute. See *People v Assy*, 316 Mich App 302, 307; 891 NW2d 280 (2016). This Court also reviews de novo whether a statute unconstitutionally infringes speech protected under the First Amendment. See *People v Vandenberg*, 307 Mich App 57, 61; 859 NW2d 229 (2014). This Court reviews a trial court's decision on a motion to dismiss charges for an abuse of discretion. See *People v Nicholson*, 297 Mich App 191, 196; 822 NW2d 284 (2012). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*.

### 2. APPLICABLE LAW & ANALYSIS

The Legislature made it unlawful to disturb the peace:

> Any person who shall make or excite any disturbance or contention in any tavern, store or grocery, manufacturing establishment or any other business place or in any street, lane, alley, highway, public building, grounds or park, or at any election or other public meeting where citizens are peaceably and lawfully assembled, shall be guilty of a misdemeanor. [MCL 750.170.]

For more than 40 years, Michigan courts have recognized that this statute was unconstitutionally overbroad because it—in relevant part—criminalized the exciting of a contention, which improperly encompassed the expression of ideas that might be offensive to others. See *Vandenberg*, 307 Mich App at 63-67, citing in relevant part *People v Purifoy*, 34 Mich App 318, 321; 191 NW2d 63 (1971) (opinion by LESINSKI, C.J.). However, Michigan courts also have long held that the problem could be avoided by reading the "excite any contention" language out of the statute. Therefore, if the trial court does not instruct the jury using the "contention" language, there is no constitutional problem with the statute. *Vandenberg*, 307 Mich App at 66-67; see also *People v Mash*, 45 Mich App 459, 462-463; 206 NW2d 767 (1973) (stating that the constitutional problem was not present in its case because the jury was instructed using only the disturbance language). In this case, the trial court did not instruct the jury that it could convict Vreeland if it found that he excited a contention; rather, as the prosecutor correctly notes, it instructed the jury on disturbance alone: it stated that the prosecutor had to prove beyond a reasonable doubt that Vreeland "did make or excite a disturbance" and that the "disturbance was in a public building."

Additionally, this Court has upheld the constitutionality of the statutory prohibition against exciting a disturbance. See *Mash*, 45 Mich App at 462-463; see also *Vandenberg*, 307 Mich App at 66-67 (agreeing that the constitutional problems with the statute can be avoided by

excising the exciting a contention language). In *Mash*, the Court defined "disturbance" to be "something less than threats of violence"; it is, the Court stated, "an interruption of peace and quiet; a violation of public order and decorum; or an interference with or hindrance of one in pursuit of his lawful right or occupation." *Mash*, 45 Mich App at 462 (quotation marks and citation omitted). Indeed, the Court in *Mash* held that the evidence that the defendant, as part of a crowd performing a sit-in, remained in a university building after hours and, thereby, prevented a janitor from performing his occupation was sufficient to establish the elements of disturbing the peace. See *id.* at 460-461, 464.

In this case, the prosecution did not charge Vreeland with disturbing the peace because he had a camera or expressed certain ideas. Rather, the prosecutor presented evidence that Vreeland had engaged in an angry encounter with Dearborn police officers earlier in the day and that he and Baker decided to stage a confrontation with Dearborn officers. They proceeded to the DPD office while dressed in military-style gear, which included ballistic vests that were heavier than that worn by police officers. Although Vreeland was not armed, Vreeland accompanied Baker, who was armed with a handgun and assault-style rifle, which he carried in a "ready-up" position. Under the circumstances, there was no way for a reasonable police officer viewing Vreeland's approach to know with any certainty that he was unarmed. As such, it was reasonable for the officers to assume that he was armed and dangerous, notwithstanding his protestations to the contrary during the encounter. The evidence was sufficient to permit a reasonable jury to conclude that Vreeland intended to disrupt the normal operation of the police department and actually did disrupt its normal operation. See *id.* Consequently, Vreeland did not establish that he could not be found guilty of disturbing the peace as a matter of law because the only basis for the charge was his engagement in protected activity; Vreeland did not have a constitutionally protected right to enter into the police department in a manner calculated to disrupt its normal operation. See *id.*

For similar reasons, Vreeland failed to establish that his actions could not amount to resisting and obstructing.

In order to convict Vreeland of resisting and obstructing, the prosecutor had to prove that Vreeland assaulted, battered, wounded, resisted, obstructed, opposed, or endangered a police officer and that he knew or had reason to known that the person he assaulted, battered, wounded, resisted, obstructed, opposed, or endangered was a police officer performing his or her duties. See MCL 750.81d(1); *People v Quinn*, 305 Mich App 484, 491; 853 NW2d 383 (2014). The term "obstruct" is statutorily defined to include "the knowing failure to comply with a lawful command." MCL 750.81d(7)(a). Additionally, the prosecutor had to prove that the officer's actions were lawful. See *People v Moreno*, 491 Mich 38, 51-52; 814 NW2d 624 (2012).

On appeal, Vreeland makes much of the fact that, in his view, he had the right to resist the officers because the officers did not have grounds to arrest him when he first walked into the police station. More specifically, he argues that the officers' commands were unlawful. He is, however, mistaken to the extent that he suggests that a police officer can only lawfully give commands as part of a lawful arrest.

Our Supreme Court has held that police officers can lawfully order a person to stop and drop a weapon even when the officers do not have probable cause to arrest. See *People v*

*Stergowski*, 391 Mich 714, 718-719; 219 NW2d 68 (1974). Citing *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), our Supreme Court recognized that officers may lawfully protect themselves and others under situations where they may lack probable cause to arrest. *Stergowski*, 391 Mich at 718-719. That is, officers have the lawful authority to take necessary measures to determine whether the person is in fact armed and to neutralize the threat of physical harm. *Id.* at 719. The officers do not have to be certain of the danger; the question is whether a reasonably prudent person under the circumstances "would be warranted in the belief that [their] safety or that of others was in danger." *Id.* (quotation marks and citation omitted).

A reasonably prudent person observing two men approaching a police station where one man was masked, wearing a ballistic vest, and heavily armed with an assault-style rifle and a sidearm, and the other was wearing a military-style jacket that obscured his waistline, a ballistic vest, and a head covering, would be warranted in the belief that the approaching men posed a danger to the observer or others in the police station. See *id.* at 719-720 (stating that the officers not only could lawfully order the man they observed to drop his weapon, it might have been a dereliction of duty to not do so). This is especially true to the extent that the officer was aware that the men had earlier participated in an angry encounter with officers. As such, under the totality of the circumstances, the officers could lawfully take steps to secure their safety and the safety of others, which included ordering Vreeland to step back from Baker's location so that officers could secure Baker and his firearms, and ordering Vreeland to put his arms behind his back. Vreeland's failure to follow these lawful commands could serve as the basis of his conviction of resisting and obstructing, see MCL 750.81d(7)(a). The prosecutor did not have to show that the officers had probable cause to arrest him when he entered the station. See *Stergowski*, 391 Mich at 720-721 (stating that the officers had ample cause to stop and disarm the man they observed with a gun even though they might not have had probable cause to arrest him at that time). Moreover, once Vreeland resisted and obstructed the initial lawful commands, the officers had probable cause to arrest him for resisting and obstructing. See *People v Nguyen*, 305 Mich App 740, 751; 854 NW2d 223 (2014) ("In reviewing a claim that the police lacked probable cause to arrest, this Court must determine whether facts available . . . at the moment of arrest would justify a fair-minded person of average intelligence in believing that the suspected person had committed a felony.") (quotation marks and citation omitted).

The trial court did not abuse its discretion when it denied Vreeland's motion to dismiss the charges against him for disturbing the peace and resisting and obstructing. See *Nicholson*, 297 Mich App at 196.

## D. SUFFICIENCY OF THE EVIDENCE

Finally, Vreeland argues that the trial court should have granted his motion for a directed verdict where the prosecutor failed to present sufficient evidence to support his convictions. We disagree.

### 1. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for a directed verdict. See *People v Chelmicki*, 305 Mich App 58, 64; 850 NW2d 612 (2014). "In challenges to the sufficiency of the evidence, this Court reviews the record evidence de novo in the light most

favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009). The same standard applies to a trial court's decision to deny a motion for directed verdict except that this Court only considers the evidence presented by prosecutor up to the time of the motion. See *People v Schultz*, 246 Mich App 695, 702; 635 NW2d 491 (2001).

## 2. LAW & ANALYSIS

### a. VENUE

Vreeland argues on appeal that the prosecutor failed to establish that the crimes at issue occurred in Wayne County because no one testified that the Dearborn police station was in Wayne County. The question of venue is generally a question of fact for the jury. See *People v Watson*, 307 Mich 596, 603; 12 NW2d 476 (1943). In presenting evidence to establish venue, the prosecutor does not have to present testimony mentioning the name of the county; it is sufficient that the prosecutor present evidence that the crime was committed in a community generally known to be within the county at issue. See *People v Smith*, 28 Mich App 656, 658; 185 NW2d 185 (1970), citing *People v Ranes*, 230 Mich 384; 203 NW 77 (1925), and *People v Rimkus*, 219 Mich 550; 189 NW 30 (1922). Likewise, jurors are presumed to have knowledge of local geography, and the prosecutor may prove venue through testimony that the crime occurred at some known landmark. See *People v Andrews*, 360 Mich 572, 575; 104 NW2d 199 (1960).

In this case, an officer testified about the events giving rise to Vreeland's disturbing the peace conviction and resisting and obstructing conviction, and he stated that those events occurred at 16099 Michigan Avenue in Dearborn, Michigan. Another officer testified that the video showing Baker and Vreeland illegally transporting a firearm in the car occurred near Geer Park, which was off Prospect Street in Dearborn, Michigan. As the trial court aptly noted, the addresses were all known locations within Dearborn, which was generally known to be in Wayne County. Therefore, the prosecutor provided sufficient evidence to permit the jury to find beyond a reasonable doubt that venue was in Wayne County. *Id.*

### b. CCW

Vreeland also argues that the prosecutor failed to present sufficient evidence to establish that he committed CCW. More specifically, he maintains that the prosecutor failed to prove that Baker did not transport the firearm in a gun case, as required by law. He similarly maintains that there was no evidence that he carried the handgun within the meaning of the statute.

In order to convict Vreeland of CCW under MCL 750.227(2), the prosecution had to prove that (1) Vreeland operated or occupied a vehicle while a pistol was present in the vehicle, (2) Vreeland knew about the pistol, and (3) Vreeland carried the pistol. See *Nimeth*, 236 Mich App at 622. As already noted above, one can carry a pistol without actually possessing it because the term "carrying" encompasses constructive possession. See *Butler*, 413 Mich at 390 n 11. Moreover, proof of possession does not require proof of ownership, and possession may be established jointly with another person. See *Wolfe*, 440 Mich at 520. The key question is

whether the prosecution presented evidence from which the jury could find that Vreeland had the right to exercise control over the pistol. *Id.*

At trial, the prosecutor admitted video recorded by a camera found on Vreeland's body. The video showed Vreeland standing over the open trunk of the car that was later seized at the police station. In the video, Baker approached the trunk, took a handgun, and removed the magazine. He then dropped the handgun into the trunk with, as Vreeland concedes on appeal, an audible metal noise. The video shows that there was a large gun case in the trunk that was suitable for a rifle such as the one that Baker later carried into the police station, but the case was closed and the video demonstrates that Baker did not open it. Rather, the video suggests that Baker just dropped the handgun into the trunk to the side of the case. Vreeland and Baker then discussed what to do next on the video, and Vreeland closed the trunk, went to the driver's side of the car, and drove the car away.

The video constitutes sufficient evidence that Vreeland knew about the handgun and operated the car with the handgun in it. Further, although there was evidence that the gun belonged to Baker and that Baker alone exercised direct physical control over it, there also was evidence from which the jury could have found that Vreeland had the right to exercise control over it. Vreeland watched Baker put the handgun into the trunk and discussed with Baker what they should do next. He also closed the trunk, had the most direct access to the trunk after closing it, had the keys to the car, and drove the car away. As such, he had clear access to the weapon. The fact that he discussed his plans with Baker also suggested that they were acting in concert and that the handgun was part of their planned joint activities. This Court must view the evidence in the light most favorable to the prosecution, see *Roper*, 286 Mich App at 83, and taken in that light, a reasonable jury could find that Vreeland had joint control over the handgun with Baker. See *Wolfe*, 440 Mich at 514-515 (stating that the jury is free to draw its own inferences and that it is not for an appellate court to second-guess the jury's resolution of a question of fact).

Similarly, even though the video does not depict the interior of the trunk at the exact moment that Baker put the handgun into the trunk, the video does capture a view of the trunk just moments before he did so. The video shows that the gun case was not open, and it is evident that Baker did not have time to open it. Further, the video recorded a sound that strongly suggests metal on metal contact caused by the dropping of the handgun at the moment when Baker put the handgun into the trunk. From that, a reasonable jury could find that Baker did not place the gun in the case; rather, it could find that he dropped it into the trunk. The jury could then find beyond a reasonable doubt that Vreeland did not transport the handgun in the manner required under MCL 750.231a(1)(d) (providing that the handgun must be unloaded and in a closed case designed for the storage of firearms in the trunk of the vehicle). Consequently, the prosecutor presented sufficient evidence to establish that Vreeland constructively possessed the handgun and that Baker and Vreeland did not lawfully transport the handgun in the trunk of the car. See MCL 750.227(2); MCL 750.231a(1)(d).

## c. DISTURBING THE PEACE

The prosecution also presented sufficient evidence to establish that Vreeland disturbed the peace. In order to establish the elements of that offense with the "contention" language

omitted, see *Vandenberg*, 307 Mich App at 66-67, the prosecutor had to present evidence that Vreeland made or excited a disturbance "in any tavern, store or grocery, manufacturing establishment or any other business place or in any street, lane, alley, highway, public building, grounds or park, or at any election or other public meeting where citizens are peaceably and lawfully assembled . . . ." MCL 750.170. The term disturbance means an act that amounts to an "interruption of peace and quiet; a violation of public order and decorum; or an interference with or hindrance of one in pursuit of his lawful right or occupation." *Mash*, 45 Mich App at 462 (quotation marks and citation omitted).

The prosecution presented evidence that Vreeland went to the DPD office with Baker and that they did so in a manner that was either calculated to cause a reaction by the police officers at the station or likely to do so. The evidence showed that Vreeland dressed in a military-style jacket that obscured his waistline. He also wore a ballistic vest under the jacket, wore a head covering, and held a camera on a tripod. He further accompanied Baker, who also wore a ballistic vest, covered his face with a ski mask, and was armed with a handgun and an assault-style rifle in a "ready-up" position. Officers testified that Baker and Vreeland approached and entered the police station as though "on a mission" and in a way that appeared aggressive. Multiple officers testified that they feared that Baker and Vreeland intended to engage the officers in a gun fight. For that reason, several officers ceased other work and responded to the front of the police station to address what they perceived to be a dangerous and emergent situation. The officers even took steps to evacuate the lobby of civilian persons and personnel. Although the prosecution did not have to prove motive, the video evidence also suggested that Baker and Vreeland dressed themselves and approached in a way to excite a disturbance. See, e.g., *People v Kuhn*, 232 Mich 310, 312; 205 NW 188 (1925) (explaining the distinction between motive and intent and noting that motive will often illuminate intent). Consequently, a reasonable jury examining the totality of the evidence could find beyond a reasonable doubt that Vreeland actually excited a disturbance and that he did so in a public building. See MCL 750.170.

Contrary to Vreeland's contention on appeal, the statute did not also require the prosecution to prove that a meeting was occurring at the time. The statute makes it a misdemeanor to make or excite a disturbance in "any tavern, store or grocery, manufacturing establishment or any other business place" *or* "in any street, lane, alley, highway, public building, grounds or park" *or* "at any election or other public meeting where citizens are peaceably and lawfully assembled." The use of the disjunctive term "or" separates the categories into three groups: buildings that are places of business; public places, which includes public buildings; and elections or other public meetings. Therefore, a prosecutor can establish the elements of the crime by showing that the defendant made or excited a disturbance in three distinct ways only the last of which required showing that there was a meeting where citizens were peaceably and lawfully assembled. See *People v Kowalski*, 489 Mich 488, 499; 803 NW2d 200 (2011) (noting that the use of the disjunctive term "or" generally indicates a choice between alternatives). Further, this Court has held that a person can disturb the peace by disrupting an employee's pursuit of his lawful right or occupation in a public building. See, e.g., *Mash*, 45 Mich App at 464 (holding that there was sufficient evidence to establish the elements where the defendant entered a public building and prevented the janitor from pursuing his lawful right or occupation).

Here, the evidence overwhelmingly showed that Vreeland excited or made a disturbance at the police station. Vreeland not only walked into the police station under circumstances that reasonably caused the officers to fear danger, but he also repeatedly refused to obey their commands, swore at them, and generally disrupted normal operations for his own purposes. There was sufficient evidence to support Vreeland's disturbing the peace conviction. See *Roper*, 286 Mich App at 83.

### d. RESISTING & OBSTRUCTING

Finally, the prosecution presented sufficient evidence to establish the charge of resisting and obstructing. As already noted, to convict Vreeland of this charge, the prosecutor had to prove—in relevant part—that Vreeland obstructed a police officer and that he knew or had reason to known that the person he obstructed was a police officer performing his or her duties. See MCL 750.81d(1); *Quinn*, 305 Mich App at 491. The term "obstruct" includes a "knowing failure to comply with a lawful command." MCL 750.81d(7)(a). The prosecutor also had to prove that the officers were acting lawfully. See *Moreno*, 491 Mich at 51-52.

The prosecution presented evidence that the officers at the police station reasonably feared for their own safety and for the safety of the general public. When officers have a reasonable fear that an armed person poses a danger to the officers or the general public, the officers may lawfully order that person to disarm and take other steps to protect the officers' own safety and the safety of the public. See *Stergowski*, 391 Mich at 718-719, citing *Terry*, 392 US at 24. For that reason, a reasonable jury could find that the officers' lawfully ordered Vreeland to step away from Baker to allow other officers to secure Baker and Baker's weapons. The video evidence showed that Vreeland deliberately refused to obey those orders. Indeed, the video evidence recorded his statements that he felt he did not have to obey the officers' commands. From that, the jury could find beyond a reasonable doubt that Vreeland obstructed the officers. There also was testimony that even after Vreeland eventually moved away from Baker as he had been repeatedly ordered to do, he nevertheless resisted the officers' lawful attempt to arrest him. This evidence was sufficient to support Vreeland's conviction of resisting and obstructing. See *Roper*, 286 Mich App at 83.

The prosecutor presented sufficient evidence to support each of the verdicts against Vreeland.

### III. CONCLUSION

Baker and Vreeland both failed to identify any errors that warrant vacating their sentences, a new trial, or resentencing. Accordingly, we affirm.

/s/ Christopher M. Murray
/s/ Cynthia Diane Stephens
/s/ Michael J. Riordan